**APPENDIX** - Filed September 14, 2010
(Excerpts from the Decision of the Court of Criminal Appeals)

## IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT NASHVILLE
September 17, 2008 Session

### STATE OF TENNESSEE v. JOEL RICHARD SCHMEIDERER

**Direct Appeal from the Circuit Court for Maury County**
**No. 14488          Jim T. Hamilton, Judge**

_____

**No. M2007-01922-CCA-R3-DD - Filed April 9, 2009**

_____

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and J.C. MCLIN, JJ., joined.

Sharon D. Aizer, Columbia, Tennessee (on appeal); Claudia S. Jack, Shipp Weems, and Michelle VanDeRee, Columbia, Tennessee (at trial) for the Defendant, Joel Richard Schmeiderer.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; James E. Gaylord, Assistant Attorney General; Mike Bottoms, District Attorney General; Joel Douglas Dicus and Patrick S. Butler, Assistant District Attorneys General, for the Appellee, State of Tennessee.

### OPINION

**[Section II.  Analysis]**

**B.  Voir Dire**

    The Defendant next argues that the trial court erred during voir dire.  Specifically, the Defendant asserts that the trial court erred because: (1) it allowed the State to shift the burden to the Defendant to "put on evidence" of mitigation; (2) it limited his questions, and the phrasing of those questions, of prospective jurors; (3) it struck eleven women without allowing for rehabilitation of those potential jurors and without making a record; (4) it improperly denied the Defendant's request to strike prospective juror Jonathan

White for cause; and (5) it improperly excused prospective juror Manual Oskian for cause. The State's response to each of these assertions will be discussed in their respective sections below.

Article I, section 9 of the Tennessee Constitution guarantees a criminal defendant the right to trial "by an impartial jury." In fact, every accused is guaranteed "a trial by a jury free of . . . disqualification on account of some bias or partiality toward one side or the other of the litigation." *State v. Akins*, 867 S.W.2d 350, 354 (Tenn. Crim. App. 1995) (citing *Tooms v. State*, 197 Tenn. 229, 270 S.W.2d 649, 650 (1954)). Thus, the function of voir dire is essential. Voir dire permits questioning by the court and counsel in order to lead respective counsel to the intelligent exercise of challenges. *Id.* (citations omitted). A trial court is vested with great discretion in conducting the selection of a fair and impartial jury. *State v. Howell*, 868 S.W.2d 238, 247 (Tenn. 1993), *cert. denied* 510 U.S. 1215 (1994); *State v. Harris*, 839 S.W.2d 54, 65 (Tenn. 1992), *cert. denied*, 507 U.S. 954 (1993); *see* Tenn. R. Crim. P. 24(a). Thus, this Court must uphold the trial court's ruling unless the defendant establishes the existence of a clear abuse of discretion. *State v. Raspberry*, 875 S.W.2d 678, 681 (Tenn. Crim. App. 1993).

### 1. Shifting of Burden to Defendant

The Defendant claims that the trial court erred when it permitted the State to improperly shift the burden to him to present evidence mitigating against the imposition of the sentence of death by pointing out several times to the jury, and in several ways, that the defense would be presenting such evidence. The State counters that the Defendant did not object until the third day of voir dire and, therefore, cannot complain that the jury impaneled on the first two days was tainted. Further, it asserts that the comments did not shift the burden but rather alluded to the possibility that the defense would bring up mitigating circumstances, which is, in fact, an accurate statement in most cases. Finally, the State contends that the comments are not jury instructions and that the jury was properly instructed that the Defendant did not have the burden of proving a mitigating circumstance.

The record reflects that the prosecution repeatedly said during the voir dire of prospective jurors that the defense would be presenting evidence of mitigating circumstances. The Defendant did not object until the third day of voir dire, and he objected to only one statement, which will be discussed below. According to Tennessee Rule of Appellate Procedure 36(a), relief is not available to a party "who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of the error." Therefore, a defendant must object contemporaneously to statements by the prosecution that the defendant believes to be legally wrong or misleading. *State v. Alder*, 71 S.W.3d 299, 302 (Tenn. Crim. App. 2001). The Defendant has, therefore, waived our

-2-

review of the statements occurring before and after his objection, statements to which he made no contemporaneous objection.

In the comment made by the prosecutor to which the Defendant did object, the prosecutor said, "The defense can put on evidence they want to, in this part of the trial. We call them mitigating circumstances. Anything . . . they want you to consider about the defendant . . . whatever, that they think you need to consider in making this decision." Defense counsel objected, claiming that the prosecutor shifted the burden of presenting mitigating evidence to the Defendant. The trial court ruled that the State had merely told the jury that the Defendant presenting mitigating evidence was a possibility, which is a fact jurors "need to know."

We understand the Defendant's argument to be that the prosecutor, by repeatedly informing the jury that the Defendant can present mitigating evidence, created the expectation that if the Defendant did not present such evidence then there is no evidence mitigating against a sentence of death. In fact, any evidence presented to the jury from the State or the defense can constitute evidence of a mitigating circumstance. *See* T.C.A. § 39-13-204(j)(9) (2003). Upon our thorough review of the record, we do not agree with the Defendant's interpretation of the prosecutor's comments. The State said, "The defense *can* put on evidence . . . ." (emphasis added). This comports more with the State's contention that its comments were informing the jury of what may happen during the trial and did not shift the burden to present mitigating proof to the Defendant. We conclude that the trial court did not abuse its broad discretion when it allowed the State to tell the jury that the Defendant can present mitigating evidence.

## 2. Questioning of Prospective Jurors
### a. Mitigating Circumstances

The Defendant contends that the trial court erroneously limited the remarks he made and questions he asked potential jurors during voir dire. First, the Defendant argues that the trial court erred when it refused to allow the Defendant to ask each potential juror what he or she considered to be a mitigating circumstance. The State responds that the trial court, in an effort to limit the defense's use of open-ended questions, properly required the defense to use a more narrowly tailored question to elicit the jurors' propensity for bias.

A Defendant has a right to "a trial by a jury free of . . . disqualification on account of some bias or partiality toward one side or the other of the litigation." *Akins*, 867 S.W.2d at 354. Therefore, a trial court "shall permit the parties to ask questions for the purpose of discovering bases for challenge for cause and intelligently exercising peremptory challenges." Tenn. R. Crim. P. 24(b)(1). As previously set forth, however, the scope and extent of voir dire is entrusted to the discretion of the trial court, and the

-3-

trial court's rulings will not be reversed on appeal absent an abuse of discretion. *State v. Smith*, 993 S.W.2d 6, 28 (Tenn. 1999). Merely "[r]equiring defense counsel to ask clearer, more-pointed and understandable questions is not an abuse of discretion." *State v. Jerry Lynn Walde*, No. 03C01-9603-CC-00109, 1997 WL 789964, at *6 (Tenn. Crim. App., at Knoxville, Dec. 23, 1997), *perm. app. denied* (Tenn. Jan. 4, 1999).

During voir dire, the Defendant requested permission to ask each juror to explain what he or she considered to be a mitigating circumstance of homicide. The trial court said defense counsel must ask a "more-pointed" question, requiring the Defendant to list several statutory mitigating factors and, following each factor, ask each juror whether he or she considered the factor "mitigating." In our view, the trial court's limitation was intended to extract a "clearer, more-pointed and understandable" question. *See id.* Therefore, the trial court did not abuse its discretion in this matter. *Id.*

### b.  Phrase "Put a Fellow Citizen to Death"

The Defendant next contends that the trial court erred when it prohibited him from saying that the State was seeking to "put a fellow citizen to death" because such a limitation "tends to minimize the impact of the jury's role" in violation of *Caldwell v. Mississippi*, 472 U.S. 320 (1985). The State disagrees with the Defendant's interpretation of *Caldwell* and says the trial court did not err when it required the Defendant to say that the State was "seeking the death penalty" instead of that the State was seeking to "put a fellow citizen to death."

In *Caldwell*, the U.S. Supreme Court held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." 472 U.S. at 328. As a result, *Caldwell* prohibits remarks that "suggest to the jury that their decision to impose the death penalty would be temporary, tentative, or conditional, depending on the review of higher courts." *McCormick v. State*, No. 03C01-9802-CR-00052, 1999 WL 394935, at *20 (Tenn. Crim. App., at Knoxville, June 17, 1999), *no Tenn. R. App. P. 11 application filed*. For example, a trial court may not instruct the jury, as the *Caldwell* trial court did, that the jury's imposition of a death sentence is not binding or valid in any sense because it is subject to appellate review. *Id.*

We conclude the trial court did not violate *Caldwell* when it required the Defendant to use the phrase "seeking the death penalty" instead of "seeking to put a fellow citizen to death." The phrase "seeking the death penalty" did not suggest to the jury that its decision to impose a death sentence was only "temporary, tentative, or conditional." *McCormick*, 1999 WL 394935, at *20. The limitation did not lessen the impact upon the jurors of the nature of their responsibility as jurors sitting on a trial where the death penalty is requested. *Id.*; *see Caldwell*, 472 U.S. at 328. The trial court did not

abuse its broad discretion or violate *Caldwell* when it limited the Defendant, and the Defendant is not entitled to relief on this matter. *Id*.

### 3. Excusing Prospective Jurors

The Defendant argues that the trial court violated his right to equal protection of the laws when it excused eleven potential jurors, all of whom were women, without giving the Defendant a chance to rehabilitate them and without making a record of its decision. The State responds that the trial court did not violate the Defendant's constitutional rights and that the trial court properly excused each of the jurors based upon each juror's explanation of how serving as a juror would be a hardship for them. The State points out that many of the female jurors were excused because they were solely responsible for the care of their small children, which has been found by other courts to be a valid reason for being excused, citing *Johnson v. United States*, 307 F. Supp. 2d 380, 387 (D. Conn. 2003).

Pursuant to Tennessee Code Annotated section 22-5-307(a) (2003), a person summoned for jury service must appear at the specified time and place "unless excused therefrom or discharged by the judge." In the case under submission, the prospective jurors were excused when they appeared in court based on the court's consideration of the information provided by the jurors to the trial court's inquiries. At the time of the Defendant's trial, the relevant code section provided that "any person may be excused from serving as a juror . . . when, for any reason, the person's own interests, or those of the public, will, in the opinion of the court, be materially injured by the person's attendance." *See* T.C.A. § 22-1-104(a) (2003) (repealed 2009). The statute further provided that "any person, when summoned to jury duty, may be excused upon a showing that such person's service will constitute an undue hardship." T.C.A. § 22-1-104(b) (repealed 2009). Further, the law in effect at the time of the Defendant's trial provided that the "court may discharge from service a grand or petit juror . . . for any other reasonable or proper cause, to be judged by the court." T.C.A. § 22-1-105 (Supp. 2008).[1]

The Defendant in this case contends that the trial court systematically excluded women from the jury venire. Further, the Defendant states that, had this exclusion been the result of the State's use of peremptory strikes, he could have sought some recourse, but, because it was perpetuated by the trial court, he had no such recourse. The United States Supreme Court has addressed whether peremptory challenges on the basis of gender violate the Equal Protection Clause holding, "Intentional discrimination on the basis of gender by a state actor violates the Equal Protection Clause, particularly where . . . the discrimination serves to ratify and perpetuate invidious, archaic, and overbroad

---

[1]At the time of the Defendant's trial, this statute was codified at Tennessee Code Annotated section 22-1-106.

stereotypes about the relative abilities of men and women." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 130-31 (1984). The Court clarified that intention to exclude based on gender is a requirement for there to be an Equal Protection violation. Even exclusions "based on characteristics that are disproportionately associated with one gender could be appropriate, absent a showing of pretext." *Id.* at 143. The Court then gives the example that "challenging all persons who have had military experience would disproportionately affect men at this time, while challenging all persons employed as nurses would disproportionately affect women. Without a showing of pretext, however, these challenges may well not be unconstitutional, since they are not gender or race based." *Id.* (citing *Hernandez v. New York*, 500 U.S. 352 (1991)).

According to our review of the record, during voir dire the Defendant objected stating:

> Your Honor, we had 30 jurors come today. Out of those 30 jurors for cause, there w[ere] 12 people that approached Your Honor, asking for a for-cause-excuse; Your Honor granted all of them with the exception of one, Ms. Hanes. Actually, there w[ere] 13 including Ms. Hanes. Out of the 12 of the 30, 11 were females. And, of course, females have certain problems, and the Court addressed it: Children, et cetera.
>
> I would like to take exception to the Court's ruling excluding these 11 people. Females are a recognizable class that the courts have held there should be adequate provocation before they're excused. I don't know how many remaining jurors in that 30, were females. But I do know that 11 approached Your Honor. And I know we have lost the opportunity to have at least 11 females on the jury.

In total, the trial court excused thirteen prospective jurors based upon an undue hardship before the Defendant's objection, and eleven of those thirteen jurors were female.[2] The trial court asked that the potential jurors who felt incapable of serving due to the necessary five-night sequestration to identify themselves. The trial court then called each potential juror up to the bench and had a private conversation about the person's reasons for not being able to serve by staying in a hotel for five nights. After each conversation, the trial court announced why it was dismissing that potential juror. The following occurred during the questioning of each juror:

---

[2]In the trial court's order on the Defendant's motion for new trial, it also addresses why female jurors Linda Knox, Jane Karp, Kay Pitts, Shannon Cyphers, and Joe Etta Braswell were excused. These jurors were excused after the Defendant's objection and do not seem to be the subject of this appeal. We will, therefore, not address the trial court's excusing these jurors.

### a. Alberta Hooks

**The Court:**  So, Ms. Hooks, we'll just start with you.  You want to come up here?

(Ms. Hooks complied.)

**The Court:**  Yes, ma'am.

(Whereupon, a discussion took place between Ms. Hooks and the Court.  And then, the following proceedings were had.)

**The Court**:  She has children problems.  A single parent.  And thank you.  Good luck to you.

**Ms. Hooks:**  Thank you.

(Ms. Hooks was excused).

### b. Jennifer Miller

**The Court:**  All right.  We'll just start here on the front row.  And your name is?

**Ms. Miller:**  Miller.

**The Court:** Jennifer Miller, should be number 22

(Whereupon, a discussion took place between Ms. Miller and the Court.  And then, the following proceedings were had.)

**The Court:**  She has two children.  No one will be able to pick them up.  Okay.

(Ms. Miller was excused.)

### c. Tina Foster

**The Court:**  All right.  Yes, ma'am.

**Ms. Foster:**  Tina Foster.

**The Court:**  Yes, ma'am.

**Ms. Foster:**  I've got children.  My husband works all day.  I just don't think the youngest one would do well, for five days, without her mamma.

**The Court:**  Okay.  All right.  We'll excuse you then.  Ms. Tina Foster.  Thank you, ma'am.

(Ms. Foster was excused.)

### d. Frances Smith

(Whereupon, a discussion took place between Ms. Smith and the Court.  And then, the following proceedings were had.)

**The Court:** What's your name?

**Ms. Smith:** Frances Smith.

**The Court:** This is Frances Smith. And she has two children. And no one can help but her. Right?

**Ms. Smith:** Right.

**The Court:** Okay. Ms. Smith, we'll excuse you. Thank you.

(Ms. Smith was excused.)

### e. Sandy Small

**The Court:** All right. Yes, ma'am.

(Whereupon, a discussion took place between Ms. Small and the Court. And then, the following proceedings were had.)

**The Court:** What is your name, Ms?

**Ms. Small:** Sandy Small.

**The Court:** Sandy Small. She has two children. Her husband works out of town. So we'll excuse you.

. . . .

(Whereupon Ms. Small was excused.)

### f. Dena McClellan

**The Court:** All right. Yes, ma'am.

(Whereupon, a discussion took place between Ms. McClellan and the Court. And then, the following proceedings were had.)

**The Court:** Her daughter graduates from high school. All right. We'll excuse you. Thank you.

(Mc. McClellan was excused.)

### g. Lou Ann Gibbs

**The Court:** Yes, ma'am. What's your name?

**Ms. Gibbs:** Lou Ann Gibbs.

. . . .

(Whereupon, a discussion took place between Ms. Gibbs and the Court. And then, the following proceedings were had.)

**The Court:** Her job is going to take her out of town until next week. So, thank you, ma'am.

(Ms. Gibbs was excused.)

**Ms. Jack:** Is that Ms. Gibbs?

**The Court:** Ms. Gibbs.

### h.  Elizabeth Daniels

**The Court:**  This is Elizabeth Daniels.

. . . .

(Whereupon, a discussion took place between Ms. Daniels and the Court.  And then, the following proceedings were had.)

**The Court:**  All right.  Two children, 6 and 10.  No one's there when they get home from school.  Thank you.

(Ms. Daniels was excused.)

### i.  Theresa Blocker

**The Court:**  All right.  Yes, ma'am.

(Whereupon, a discussion took place between Ms. Blocker and the Court.  And then, the following proceedings were had.)

**The Court:**  All right.  A 7-year-old at home and her husband works nights.  Thank you, ma'am.

(Ms. Blocker was excused.)

**General Dicus:**  What was her name, Judge?

**The Court:**  Theresa Blocker.

### j.  Nelda Bone

**The Court:** All right.  Yes, ma'am.

**Ms. Bone:**  Nelda Bone.

**The Court:**  All right.  Ms. Bone is number 8.

(Whereupon, a discussion took place between Ms. Bone and the Court.  And then, the following proceedings were had.)

**The Court:**  She's across from her mother-in-law who's ill.  Thank you, ma'am.

(Ms. Bone was excused.)

### k. Kimberly Sisk

**The Court:** Kimberly Sisk.  All right.  She has her grandfather.  Thank you, ma'am.

(Ms. Sisk was excused.)

Upon our detailed examination of the record, the trial court excused each one of these female jurors for reasons other than gender. Each of these jurors requested to be excused and provided the trial court with reasons why serving as a juror would be an undue hardship. It is clear that the trial court acted within its discretion when it excused these jurors based upon their showing that service as jurors would constitute undue hardship. *See* T.C.A. § 22-1-104(b) (repealed 2009).

Further, we find no merit in the Defendant's contention that the trial court's excusing these women amounted to a systematic excusing of women from the jury venire. As previously stated, the trial court correctly applied the hardship provision of Tennessee Code Annotated section 22-1-104(b). The fact that such application allows the trial court to excuse mothers who have no alternative methods of childcare is, as other courts have found, perhaps an inevitable result of a hardship exemption. *See Bratcher v. Commonwealth*, 151 S.W.3d 322, 345-46 (Ky. 2004) (holding that a trial court's application of the hardship provision of the Kentucky statute to excuse mothers with no alternative methods of childcare was perhaps an inevitable result of a hardship exemption); *People v. Olson*, 377 N.E.2d 371, 376 (Ill. App. 1978) (holding trial court's excusal of women who were unable to make arrangements for the care of their children was not unreasonable); *State v. Taylor*, 771 S.W.2d 387, 400 (Tenn. 1989) (holding that proof did not show a systematic exclusion of women in the grand jury selection process where the trial court stated that there were no automatic exemptions granted women but that women would frequently offer compelling reasons for excusal, namely the care of young children); *see also Johnson*, 307 F. Supp. 2d at 387 (holding, "Trial courts have long recognized that jurors with young children should be excused for cause when they are unable to obtain child-care for their children"); *McArthur v. State*, 351 So.2d 972, 975 (Fla. 1977) (upholding the constitutionality of a Florida statute excusing from jury service pregnant women and women with small children); *State v. George*, 476 S.W.2d 903, 906-07 (S.C. 1996) (holding that statutory excusals of three women with young children from jury service pursuant to "child care" exemption did not violate defendant's right to a venire pool reflecting fair cross-section of a community). We conclude that the trial court's actions in the case presently before us do not constitute the sort of "[i]ntentional discrimination on the basis of gender by a state actor" that violates the constitution. *See J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. at 130-31.

### 4. Juror Jonathan White

The Defendant argues that the trial court erred because it did not grant his motion to strike potential juror Jonathan White for cause based on Juror White's belief that life without parole was not a sufficient punishment for first degree murder. The Defendant avers that he was forced to use a peremptory strike to dismiss Juror White, which left Juror Boatwright on the panel. Juror Boatwright, the Defendant says, was incompetent to serve because, "of all the prospective jurors, she was the one whose individual voir dire

was the most restricted by the court," meaning the Defendant "knew very little about her." The State counters that Juror White said he would weigh the mitigating circumstances and assign the death penalty only when the mitigation was not sufficient. Further, it asserts there is no evidence to support the Defendant's contention that Juror Boatwright was incompetent.

The Defendant points us to the following exchange between defense counsel and Juror White, which occurred after defense counsel gave Juror White a hypothetical situation where a defendant, with an abusive childhood as well as an ongoing psychiatric disorder, is charged with murdering another person:

Q:     Would you be able to balance [the facts] out, or would that mean anything to you?
A:     I could balance that out.
       . . . .
Q:     [I]n those facts, you hear things that tend to mitigate, or tend to soften, or tend to give a reason for the behavior or conduct of the person who's on trial.
A:     Uh-huh (affirmative).  Yes.
Q:     Okay.  And could you carry those mitigating factors with you into the jury[]room?
A:     Yes, ma'am.
       . . . .
Q:     Now, [the State] touched on some other penalties which is life.  And life, in Tennessee is 51 years before you could come before a board and be eligible for parole.  The other, is life without the possibility of parole, which means, when they take you to the penitentiary; that's going to be the home for the rest of your life.  And we've talked about the death penalty.  Do you see life, 51 years in prison as a harsh punishment?
A:     No.
Q:     You don't think that's a harsh punishment?
A:     No.
Q:     What about life without the possibility of parole?  Where you spend the rest of your life in a cage.
A:     No.
Q:     You don't think that's an adequate punishment?
A:     No.
Q:     So, given any of the specific set of circumstances, your inclination would be, if certain factors are met and you don't feel the mitigation is sufficient, that the only option for the punishment would be death?

-11-

**A:** Yes.

In response to the State's voir dire, the following exchange took place between the prosecuting attorney and Juror White:

> **Q [the State]:** Now, if we get to . . . the punishment stage of the trial, if you found him guilty of first degree murder, the judge will tell you [there are] three possible punishments that you can consider. There's life in prison[], which in Tennessee, is 51 years before you're eligible for parole. Life without parole, which is just what it says, you can never be paroled. Or the death penalty. Do you think you would be able to fairly, and impartially, consider all three punishments?
>
> **A [Juror White]:** Yes, sir.

As previously stated, both the United States and Tennessee Constitutions guarantee a criminal defendant to the right to a trial by an impartial jury. *See* U.S. Const. amend. VI; Tenn. Const. art. I, § 9. To that end, parties in civil and criminal cases are granted "an absolute right to examine prospective jurors" in an effort to determine that they are competent. See T.C.A. § 22-3-101 (2003). The "proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)); *State v. Reid*, 213 S.W.3d 792, 835-36 (Tenn. 2006). "[T]his standard . . . does not require that a juror's biases be proved with 'unmistakable clarity.'" *Id.* Instead, the trial court must have the "definite impression" that the prospective juror cannot follow the law. *State v. Hutchinson*, 898 S.W.2d 161, 167 (Tenn. 1994) (citing *Wainwright*, 469 U.S. at 425-26). Irrespective of whether the trial judge should have excluded the challenged jurors for cause, any possible error is harmless unless the jury who actually heard the case was not fair and impartial. *State v. Howell*, 868 S.W.2d 238, 248 (Tenn. 1993); *State v. Thompson*, 768 S.W.2d 239, 246 (Tenn. 1989). The failure to correctly excuse a juror for cause is grounds for reversal only if the defendant exhausts all of his peremptory challenges and an incompetent juror is forced upon him. *Ross v. Oklahoma*, 487 U.S. 81, 89 (1988); *State v. Jones*, 789 S.W.2d 545, 549 (Tenn. 1990). Finally, the trial court's finding of bias of a juror because of his or her views concerning the death penalty are accorded a presumption of correctness, and the defendant must establish by convincing evidence that the trial court's determination was erroneous before an appellate court will overturn that decision. *Reid*, 231 S.W.3d at 836

Initially, we note that we do not agree with the Defendant's characterization of Juror Boatwright as incompetent. The fact that defense counsel knew little about her is insufficient to establish her incompetence, in part because defense counsel had time to conduct a complete voir dire of Juror Boatwright. There is simply no evidence in the record to find that Juror Boatwright was in any way incompetent. Accordingly, the Defendant has not proven that his jury was not fair and impartial and any error in the trial court's failure to excuse Juror White would, therefore, be considered harmless. Nevertheless, we turn to consider whether the trial court should have excused Juror White for cause.

After reviewing the answers and responses of Juror White, we conclude that the trial court did not err by failing to remove Juror White for cause. Juror White confirmed that he would weigh the various enhancement and mitigating factors and determine the appropriate punishment. While Juror White said that he did not think that life without the possibility of parole was an adequate punishment for committing murder, he also said that he could fairly and impartially consider all three punishments: life with the possibility of parole; life without the possibility of parole; and a sentence of death. The Defendant has not established by convincing evidence that the trial court's determination was erroneous, and he is, therefore, not entitled to relief on this issue.

### 5. Prospective Juror Manual Oskian

The Defendant argues that the trial court erred when it removed Prospective Juror Manual Oskian because Oskian never said he would be biased. The State argues that the trial court properly dismissed Oskian based upon Oskian's responses that his judgment might be impaired because his co-worker's son was also on trial for murder and that he would be uncomfortable at work if he was empanelled on the jury.

During the questioning of Oskian, the following transpired:

**The Court:** And you had indicated that you worked with a person [at Saturn], whose son . . . is charged with murder; is that correct?

**A [Oskian]:** He's in trial. Uh-huh (affirmative).
. . . .
**A:** In Marshall County.
. . . .
**A:** [F]or me to be working with him, his son being tried and me being here, it's kind of like trying to put me in the spot.

**The Court:** So you think it might put you in a bad situation, because –

**A:** Yes. Yes.

**Q:** – his son was at trial as we speak?

-13-

**A:** Yes, sir.

**Q:** And if you were on this jury, that might cause you some conflict with this gentleman, this person?

**A:** Yes, sir.

**Q:** Why would that be?

**A:** When you work with somebody – I don't know how to phrase it – but on an assembly line, and you work with somebody, you always communicate.

**Q:** Would it make you uncomfortable then, to sit on this jury, because of that?

**A:** I think so. I think so.

**Q:** You think it might, in some manner, affect your judgment?

**A:** It might. It might.

Later, when being asked questions by defense counsel, Oskian elaborated, saying, "[I]t would . . . affect[] me when I [was] . . . working. I have known [my coworker] for 12 years. I've worked next to him for 12 years. What's going to happen to me the next 12 years, when his trial comes up?" He then said, "Just being in this trial" would "make [him] feel uncomfortable either way" the verdict went. The trial court then excused Oskian from the jury venire.

As previously stated, a trial court may discharge from service any juror for any reasonable or proper cause, to be judged by the court. T.C.A. § 22-1-105 (Supp. 2008). Whether to excuse a juror from the venire is a matter left within the sound discretion of the trial court. *See Raspberry*, 875 S.W.2d at 681. To be entitled to relief, the Defendant would have to show that, because Oskian was excused, he was left with a jury what was not fair and impartial. *See generally*, *Howell*, 868 S.W.2d at 248; *Thompson*, 768 S.W.2d at 246.

Our review of the record reveals that the trial court did not abuse its discretion when it removed Prospective Juror Oskian. Oskian expressed his concern that his close relationship with his co-worker, whose son was on trial for murder, might affect his judgment in this case. Further, he said that serving as a juror would make him uncomfortable at his place of employment. The Defendant has not shown that the trial court erred by excusing Juror Oskian, and he has not shown that the jury that was empanelled was not fair and impartial. As such, he is not entitled to relief on this issue.

### C. Sufficiency of the Evidence

The Defendant argues that the evidence presented was insufficient to support his conviction for premeditated first degree murder because the evidence against him was circumstantial and did not prove that he acted with premeditation. The State counters that

the circumstantial evidence, including the evidence of the Defendant's motive, sufficiently supports the jury's finding of premeditation.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "'A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State.'" *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (*State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to

sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

The Defendant was convicted of premeditated first degree murder. First degree murder is defined as a "premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2001). Premeditation refers to "an act done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d) (2001). Whether the defendant premeditated is for the jury to decide, and the jury may look at the circumstances of the killing to decide that issue. *Bland*, 958 S.W.2d at 660. The Tennessee Code states that, while "the intent to kill must have been formed prior to the act itself," that purpose need not "pre-exist in the mind of the accused for any definite period of time" for a defendant to have premeditated the killing. T.C.A. § 39-13-202(d). The following factors have been accepted as actions that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. *Bland*, 958 S.W.2d at 660. In addition, a jury may consider destruction or secretion of evidence of the murder, *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000), and "the planning activities by the appellant prior to the killing, the appellant's prior relationship with the victim, and the nature of the killing." *State v. Halake*, 102 S.W.3d 661, 668 (Tenn. Crim. App. 2001) (citing *State v. Gentry*, 881 S.W.2d 1, 4-5 (Tenn. Crim. App.1993)). Also, "[e]stablishment of a motive for the killing is a factor from which the jury may infer premeditation." *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004).

After considering the evidence in the light most favorable to the State, we conclude that the evidence is sufficient to support the jury's finding that the Defendant acted with premeditation when he killed the victim. The evidence proved that the Defendant and Sanderson were quietly talking in the Defendant's cell before this crime and that they stopped their conversation each time the Defendant's cellmate entered the cell. The two admittedly agreed to go teach the victim some "respect." They entered the victim's cell while he was quietly reading at a time that the guard would not be able to see the victim's cell. The Defendant took a sock and strangled the victim, telling his cellmate that he was surprised at how much the victim struggled. The Defendant then tore off a bloody section of his shirt, flushed the section down the toilet, and hid the rest of his bloody clothes under his bed. Shortly after the killing, the Defendant fell asleep in his cell. The Defendant told his cellmate, and later confirmed to investigators, that he killed the victim because the victim's sentence was not long enough for the crime the victim committed and because being charged with the victim's death would give him an opportunity to escape while being transported to and from court. This evidence is sufficient to support the jury's finding that the Defendant acted with premeditation when he killed the victim. He is not entitled to relief on this issue.

## G.  Constitutionality of Death Penalty on Its Face

The Defendant argues that the Tennessee death penalty statute is unconstitutional on its face.  Specifically, the Defendant alleges that the statute: (1) does not properly guide a jury about the standards of proof when considering whether the aggravating circumstances outweigh the mitigation evidence; (2) permits the jury to give too little weight to non-statutory mitigating factors; (3) does not inform the jury of its right to impose mercy; (4) does not require the jury to actually determine that death is appropriate but rather calls for the foreperson to list aggravating and mitigating circumstances; (5) fails to inform the jury about what happens if it does not reach a unanimous verdict; (6) requires the jury to impose death if the aggravating circumstances outweigh the mitigating circumstances; and (7) allows for the introduction of relatively unreliable evidence for aggravated circumstances and for rebuttal to mitigation evidence.  Also, the Defendant argues that he was prejudiced because the State presented the final closing argument and that the death penalty was imposed discriminately on the basis of his race, sex, geographic region, and economic and political status.  The State argues that Tennessee courts have already reviewed and rejected these claims.

The State correctly asserts that these arguments have already been made and rejected as grounds of relief.  *State v. Bush*, 942 S.W.2d 489, 524 (Tenn. 1997) (citations omitted).  This Court defers to, and is bound by, the rulings of the Tennessee Supreme Court.  As such, the Defendant is not entitled to relief on these issues.

## H.  Constitutionality of Death Penalty as Applied

The Defendant claims that Tennessee's death penalty statute is applied in a cruel and unusual manner and that it is, therefore, unconstitutional.  In Tennessee, an inmate sentenced to death is administered three chemicals to carry out the imposed sentence.  The lethal injection protocol was upheld by the Tennessee Supreme Court in *Abdur'Rahman v. Bredesen*, 181 S.W.3d 292 (Tenn. 2005).  As recently as November 2008, the Tennessee Supreme Court continued to cite *Abdur'Rahman* for the principle that the lethal injection protocol in Tennessee does not violate a defendant's Eighth Amendment right against cruel and unusual punishment.  *State v. Banks*, 271 S.W.3d 90 (Tenn. 2008).  In addition, the United States Supreme Court recently held that Kentucky's triple-injection method of execution was constitutional and did not violate an inmate's right against cruel and unusual punishment.  *Baze v. Rees*, – U.S. – , 128 S. Ct.1520, 1529 (2008).  In that opinion, the Supreme Court further stated, "A state with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk" of severe pain when compared to known and available alternatives.  *Id.* at 1537.  Tennessee's lethal injection protocol has been recognized as substantially similar to Kentucky's.  *Baze*, – U.S. –, 128 S. Ct. at 1527 (citing *Workman v. Bredesen*, 486 F.3d

896, 902 (2007)).   Thus, we conclude the Tennessee method of lethal injection is constitutional with respect to the Eighth Amendment, and the Defendant is not entitled to relief on this issue.